Burnes, J.
INTRODUCTION
This case arose out of the attempt by the plaintiffs to broker the sale of a printing press to the defendant Dataprint, the purchase of that printing press by Dataprint directly from the seller, and an altercation that took place between the defendant David A. Wooldridge and the plaintiff Philip J. Keon. This case was originally filed in this court. After it had been pending here, the claims for assault and violation of G.L.c. 93A were transferred for trial to the District Court. After trial there, the court ruled in favor of the defendant. The plaintiff then, pursuant to G.L.c. 231, §102C, retransferred the matter to this court. The case was tried de novo to a jury on the claim of assault and to me on the G.L.c. 93A claim, those being the only two remaining counts. Summaiy judgment had previously been granted on the other four counts of interference with advantageous relations, fraud, unjust enrichment and breach of contract.[1] The jury returned a verdict for the defendant David A. *335 Wooldridge on the assault. After hearing all the evidence on the G.L.c. 93A claim, I find and rule as follows:
FINDINGS OF FACT
The plaintiff Philip J. Keon (“Keon”) is the president and sole shareholder of East Coast Printing Equipment Corp. (“East Coast”). East Coast is in the business of buying and selling used commercial printing equipment. East Coast both buys for its own account, maintaining some inventory of equipment, and finds and negotiates the purchase and sale of used printing equipment for its customers. Keon has been in this business for himself since 1994; previously he worked for others in this business.
Dataprint is a printing company, producing printed products for its customers. Ralph Wooldridge (“Ralph”) is the president; David A. Wooldridge (“David”) is vice president. Martin Cohen (“Cohen”) is David’s father-in-law. Cohen worked in the printing industry for years, as a printer. He did not, and does not, work for Dataprint, nor is he now, nor was he ever, an equipment broker.
The underlying history in this case begins in May 1994. At that time, Dataprint was looking for a newer, but used, two color press. Ken Reidy (“Reidy”), who had long provided equipment brokerage services to Dataprint and was retiring, took Keon to Dataprint to introduce him. He knew Keon from their activities in the equipment brokerage business.
David first discussed with Keon purchasing a newer press. Keon presented one to him but Dataprint decided not to buy it. They then discussed another press, a larger one, being a 20" by 28" color press. David told Keon that if he found one and “it met their needs,” Dataprint would buy it through Keon. David did not give Keon a budget for the purchase of the press.
Keon began a search for this type of press. He found three, one in California, one in Andover (which was more expensive) and one in New Jersey. The one in New Jersey he found through a fellow equipment broker. This press was advertised for $125,000. Keon called David and discussed this press, a Roland Model 202 201/2" x 28[3]/8" two color offset printing press (the “Roland press”), with him. Keon told David the price was “somewhere in the $ 120,000s.” David said that he was interested; he asked Keon if he could set up a demonstration.
Keon made arrangements, at his own expense, to travel with David to New Jersey to see the Roland press. On or about June 28, 1994, David and Keon flew to New Jersey. They were picked up at the airport by Keon’s contact, Klemet Mazel. The three men drove to the plant where the Roland press was located. They were at the plant for about one half-hour, where they were introduced to the pressman and saw the press operate. Keon took some photographs of David, the Roland press and the pressman. Trial Exhibits 1A and IB.
David testified that at this visit he wanted to spend a considerable period of time in order to watch the press function. In particular, he wanted to watch the press operator hanging the plates. He did not, however, ask Keon if he could stay longer. He also testified that he thought that it was a problem that the press was not running an actual project for a customer when he had asked Keon to arrange such a demonstration. David did not tell Keon he was upset. He testified that at that point he felt that he could not trust Keon.
This testimony was not credible, for upon their return to Boston that day, David requested a formal written proposal from Keon for the purchase of the Roland press. He also gave Keon an envelope that contained a list of other used equipment that Dataprint wanted to get rid of. Trial Exhibit 4. This was the first time that David or anyone at Dataprint had told Keon that they wanted him to handle the disposal of used equipment or that this was to be part of the deal for the purchase of the new color press.
Later that day, Keon quoted Dataprint a price of $119,000 for the Roland press, which included approximately $3,000 to $4,000 in expenses for breaking down, transporting and setting up the press again at Dataprint’s plant. (To do this, Keon would have to hire riggers, movers, electricians, etc.) Trial Exhibit 3. Keon expected that he could purchase the press from the owner for $90,000. At a $119,000 sale price to Dataprint, less expenses, Keon expected a profit of $25,000 to $26,000.
There were no negotiations on price, unless one considers Dataprint’s desire that Keon take the used equipment for somewhere between $25,000 and $30,000, to be a negotiation on price. Keon told David that he could not take Dataprint’s used equipment in trade or outright but that he would take it on consignment to try to sell it for Dataprint.
This was the first time that David had negotiated with a broker. He never informed Keon that he did not have more than $100,000 to spend for a press. David did not tell Keon that his refusal to take the used equipment would or did terminate the deal.
Keon had two conversations with David after the trip to New Jersey and before the events that culminated in this lawsuit. In this first conversation, Keon called to inquire whether David had made up his mind about the press. In the second one, David said that Dataprint was “no longer interested” in the press. Additionally, he informed Keon that his father was upset that Keon would not take the equipment in trade.
Sometime in the spring of 1994, Cohen retired from his job at Finch Engraving. He knew from conversations with David that Dataprint was looking for a new color press. David “probably” told him that he wanted a Roland 202. In early July Cohen saw an ad for a Roland 202 two-color press in a trade journal. The price was $110,000 or $125,000, depending on whom you believe. Cohen told David about it and said that he thought that he could get it for $100,000. Cohen *336 then called the seller about the press, asking the seller about how many impressions it had, was it operating, would he load it on a truck? He did not tell the owner he was calling for Dataprint.
Ralph was not at the company that day (at least, not during regular business hours). David, as vice president, had not been given authority by his father to write a check on the company’s account nor apparently did he have authority to purchase the press without his father’s approval. He did, however, want to hold the press until Ralph could be consulted and write a company check if they decided to buy the press. The owner informed Cohen that if he wanted to hold the press he had to make a deposit of $5,000. Therefore, on July 14, 1994, Cohen wrote a $5,000 check on his personal account and sent it by express mail to the seller of the press.
Ralph has owned Dataprint for 32 years. In 1994 the company had gross revenues of $ 1.5 million. He was and is almost totally responsible for operating the company. He has purchased and sold equipment over the years. He has dealt with equipment brokers before and has made purchases from Ken Reidy, the man who introduced Keon to Dataprint and the Wooldridges. He knew that an equipment broker’s fee is contained within the purchase price of used equipment.
He agreed to the purchase of the Roland 202 directly from the owner. He paid $95,000 for the press: $90,000 to the owner and $5,000 for shipping and set up. He repaid Cohen the $5,000 deposit.
Ralph was aware of the location from which the press was being shipped. He testified that he did not know that it was the same press until Cohen made the arrangements to buy it. Ralph testified, not credibly, that he thought it was acceptable to buy the press without seeing it with the specifications that David had. This very experienced businessman, who kept such tight control over his operations that he would not even give his son, vice president of the company, authority to buy equipment, said that he would spend $95,000 on a used press, sight unseen. He also testified, again not credibly, that he did not even ask David if he had seen this used press for which Ralph was going to pay $95,000. David did not look at the Roland press again until after Ralph had written the check.
On July 21, 1994, David flew to New Jersey to deliver the check for the press. He received a Bill of Sale. Trial Exhibit 8. That is, he had not paid for the press until he arrived at the same plant where he had gone with Keon to look at a press which had exactly the same description as the one he was buying. David testified, not credibly, that although the owner told him how to get to the plant in the same town as he had visited with Keon, and that he went into the same building, he did not know that the press he was buying was the same press until he got into the building. He did acknowledge that he knew that it was the same press before he handed the check over. When he got back to Dataprint, he told his father that it was the same press.
In short, it is apparent, and the court so finds, that David relied on his inspection of the Roland press made under the aegis of Keon to recommend to his father that they buy the press and so did Ralph. Ralph’s testimony that he wrote checks in the amount of $95,000 relying only on what the owner told him of the condition and quality of the Roland press was simply not credible.
Some time in August, Keon learned that Dataprint had a press just like the one he had shown them. He went to the plant and checked the serial number and determined that it was, indeed, the same press. Upon being confronted by Keon, David told him that he did not know that it was the same press. Rather, he said that he bought it from an equipment dealer named Martin Cohen. Keon called Ken Reidy to discuss this matter. Reidy told Keon that Cohen was David’s father-in-law.
Keon was outraged. He returned to Dataprint and again confronted David. He demanded a commission. At this point, they had a heated argument that resulted in the actions that gave rise to the claim of assault. Keon went back to Dataprint one additional time, three or four weeks later. This time he spoke to Ralph and demanded to be paid. To this date, neither Dataprint nor either of the Wooldridges has paid Keon any commission.
CONCLUSIONS OF LAW
G.L.c. 93A, the Massachusetts Consumer Protection Act, prohibits unfair methods of competition and unfair or deceptive acts or practices. Section 11 provides a remedy for a business person. This statute is designed to instill a general duty of good faith and fair dealing in business transactions. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 299 (1980). The statute “was designed ‘to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices.’ ” Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 25 (1997). “A practice is unfair if it is ‘within . . . the penumbra of some common-law, statutory, or other established concept of unfairness ... is immoral, unethical, oppressive, or unscrupulous, [and] . . . causes substantial injury to [other businessmen].”Id. at 27 (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)). In ascertaining the fairness of challenged conduct, the crucial factors the court looks to are the “nature of the challenged conduct and or the purpose and effect of that conduct.” Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995). Conduct that a reasonable business person would find reprehensible is unfair. Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 414 (1991), rev’d on other grounds, 412 Mass. 703 (1992).
Under Chapter 93A, a seller can be liable to a broker for concealing his or her intent to sell to a purchaser' not procured by the broker or withholding information materially affecting the sale. See Bump v. Robbins, 24 Mass.App.Ct. 296, 311-12 (1987) (deception material as broker would not have expended time to consum *337 mate sale); Discover Realty Corp. v. David, 49 Mass.App.Ct., 535, 537-38 (2000) (seller who misrepresented to broker that all abutters had released rights, a fact that caused the failure of the agreement to sell, may have violated 93A). In addition, a purchaser of services may also be liable under Chapter 93A for inducing a supplier to provide services while having no intention of paying for that labor or materials. Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). Similarly, as in this case, a buyer should be liable under Chapter 93A to a broker for concealing his lack of authority to purchase an item; evaluating the item through the broker; and then concealing his subsequent purchase of the item directly from the seller in order to acquire the item at a lower cost to the purchaser.[2]
Ralph had apparently given David authority to spend $100,000 and he was not going to allow any more. David did not tell Keon (if David even knew that there was a limit) that he had no authority to spend more than such sum. David appeared to want to make the deal and was simply told “no" by his father. Keon should not have to pay for Ralph’s training in negotiation of David. David had apparent authority to negotiate and authorize the purchase of the equipment. Dataprint mislead Keon into believing that David had authority to negotiate the deal. Once the deal exceeded Ralph’s limit or had not been negotiated as Ralph desired, unbeknownst to Keon, Dataprint circumvented Keon. They wanted this press. The defendants looked only to their own self-interest in getting the press for $100,000 or less even if this meant taking advantage of Keon. Because of Dataprint’s failure to tell Keon that there was a price limit, he spent his own money to locate a press and show it to them. Keon would not have spent the time and effort to sell the press had Dataprint disclosed the price ceiling and lack of authority to purchase the press. This conduct amounts to a violation of Chapter 93A. Moreover, Dataprint took the services from Keon without intending to pay for them, (Keon had told David before they went to New Jersey that the price was in the “$ 120,000s”) when Dataprint purchased the press directly from the seller, conduct also amounting to a violation of G.L.c. 93A.
This court characterizes the totality of the defendants’ conduct as having been infused with a high enough level of rascality to have raised an eyebrow, even to those inured to the “rough and tumble” of the marketplace. Levings, 8 Mass.App.Ct. at 504. Keon expended time and money to locate and show the press to Dataprint. Despite this, Dataprint and the Wooldridges sought to get a better deal by purchasing the press directly from the seller.
For the foregoing reasons, this court finds that the defendants’ acts and practices amount to a 93A violation.
The defendants argue that East Coast Printing Equipment’s Chapter 93A claim should be dismissed because the equipment broker did not have a written contract for his professional services. See G L. c. 259, §7, Bay Colony Marketing Co. v. Fruit Salad, Inc., 41 Mass.App.Ct. 662, 664 (1996). This court disagrees.
Section 7 of the Statute of Frauds provides that “(a]ny agreement to pay compensation for service as a broker or finder . . . shall be void and unenforceable unless such agreement is in writing, signed by the party to be charge therewith, or by some other person authorized.” G.L.c. 259, §7; see Charles River Mortgage Co. v. The Baptist Home of Mass. Inc., 36 Mass.App.Ct. 277, 281 (1994). The Statute of Frauds makes certain oral contracts unenforceable. It does not bar enforcement of every single cause of action emanating from the unenforceable contract.
Defendants correctly state that the mere breach of a contract, without more, does not amount to a Chapter 93A violation. Madan v. Royal Indem. Co., 26 Mass.App.Ct. 756, 762 (1989). Further, it would be against public policy for this court to enforce a contract that is unenforceable due to Statute of Frauds through a Chapter 93A, where the action is based solely upon a simple breach of an oral agreement. Id. at 763. “Therefore, in order to show a violation of c. 93A, the plaintiff must show ‘unfair or deceptive acts or practices,’ other than the breach.” Id. The Statute of Frauds does not bar a Chapter 93A claim based upon deceptive acts apart from the breach of the oral agreement.
Here, Keon claims more than a mere breach of an oral agreement. He claims that Dataprint and the Wooldridges cheated him out of his fee by their deceptive and unfair tactics. These actsusing Keon’s services without disclosing David’s lack of authority; using Keon’s services without intending to pay him; buying the very same machine he found and showed to Dataprint and the Wooldridges without paying him a commissionare unfair or deceptive practices beyond a mere breach of an oral agreement.
David also contends that he should not be liable under Chapter 93A for unfair or deceptive practices because he had a valid reason to not go through with the salenamely, he “no longer” trusted Keon. David testified that he no longer trusted Keon because at the inspection the press was not printing an actual customer’s product. This testimony is not credible. Even after this point in time, David asked Keon questions about the press, see Trial Exhibit 5, and still asked Keon if he would take Dataprint’s old equipment in trade. And lastly, there was no evidence that David ever saw the press print a customer’s order before he bought the press.
Finally, the defendants argue that they are not liable under 93A because they “coincidentally” found the same equipment at a lower rate without wilfully knowing that it was the exact same equipment. This court finds that David and Cohen’s testimony that they did not know that this was the same press unbelievable. Prior to purchasing the press, the seller told David how to get to the same plant in the same *338 town as he had visited with Keon, and he went into the same building as Keon had taken him. In addition, David did acknowledge that he knew that it was the same press before he handed the check over.
Money damages may be recovered only for the actual damage caused by the alleged unfair or deceptive trade practice, including all losses that were the foreseeable consequence of the defendant’s unfair or deceptive act or practice. DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 101 (1983). Under Section 11, up to three, but not less than two, times the actual damages are recoverable if the court finds that the act or practice was a willful or knowing violation of Section 2. G.L.c. 93A, §11. The court finds that the defendant’s actions caused Keon damages in the amount of $25,000, the fee he would have realized absent their conduct.
The court recognizes that $25,000 is the same amount that Keon would have been entitled to recover if he had been able to prove his contract theory. This is no reason not to award him the amount under G.L.c. 93A where this is the amount of damages caused by the wrongful conduct. Where conduct is intentional, the measure of damages is the “benefit of the bargain.” See Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982); Anzalone v. Strand, 14 Mass.App.Ct. 45, 48 (1982). Furthermore, a party may recover the same amount of damages under the theory he can prove as he would have been able to recover under a theory he cannot. See e.g. Bump, 24 Mass.App.Ct. at 296 (a broker who cannot prevail under a contract theory may pursue the same damages under a tort theory for bad faith revocation of the contract). The same acts may cause the same injury, or damage, under more than one theory. Szalla v. Locke, 421 Mass. 448, 454 (1995). “[The] basic policy [of G.L.c. 93A] is to ensure an equitable relationship between consumers and persons engaged in business.” Heller v. Silverbranch Const. Corp., 376 Mass. 621, 624 (1978). Chapter 93A creates a claim in addition to traditional tort and contract remedies. McGrath v. Mishara, 386 Mass. 74, 85 (1982). A plaintiff may bring concurrent claims for recovery in addition to a G.L.c. 93A claim. Green v. Blue Cross and Blue Shield of Massachusetts, Inc., 47 Mass.App.Ct. 443, 449 (1999). In such a case, where damages are awarded under c. 93A on facts intended to support concurrent claims for damages under other theories, recovery under the other claims would be duplicative. Wolfeberg v. Hunter, 385 Mass. 390, 401 (1982); see Green, 47 Mass.App.Ct. at 449 (where defendant committed a breach of its duty of good . faith and fair dealing under G.L.c. 93A, the court did not reach the plaintiffs claims for breach of contract and misrepresentation as it would be duplicative). Since a plaintiff may recover the cumulative damages under either 93A or a common law cause of action brought together then a plaintiff must also be able to recover damages under either the contract claim or Chapter 93A claim if singularly pled. This would promote judicial economy and streamline pleadings. The court recognizes that the proper measure of damages for a Chapter 93A violation is not the contract loss. Multi Technology, Inc. v. Mitchell Management Systems, Inc., 25 Mass.App.Ct. 333, 337 (1988). Rather, “the proper measure [is] the loss causally connected to those acts which were found to be unfair and deceptive.” Id. Given the willful and intentional acts of the defendants, the loss, here, is the same loss suffered as that under the contract. Customarily, Keon builds his profit, $25,000 here, into the quoted sales price. Keon’s loss causally connected to the deceptive acts is the loss of his typical built-in profit.
Given the willful and knowing violation of Chapter 93A, this Court trebles the damages to Keon from $25,000 to $75,0000. Keon is also entitled to reasonable attorneys fees and costs, all to be determined and added to the judgment. Golber v. BayBank Valley Trust Company, 46 Mass.App.Ct. 256, 261 (1999).
The complaint has been brought by Philip J. Keon, individually and EastCoast, individually and as assignee in fact of rights vested in Dial Fix Corporation. Because there has been no evidence introduced relating to Dial Fix, all counts on its behalf shall be dismissed.
ORDER
Based on the above findings of fact and conclusions of law, this court ORDERS the following:
1) Pursuant to Count V, G.L.c. 93A, §11, judgment shall enter against each defendant jointly and severally in the amount of $25,000.
2) Pursuant to G.L.c. 93A, §11, the court trebles the damages as to each defendant;
3) Pursuant to the G.L.c. 93A, this court orders the defendants to pay the plaintiffs’ reasonable attorneys fees and costs, which shall be determined after further submissions to the court;[3] and
4) All counts on behalf of Dial Fix shall be dismissed.
Nonnie S. Burnes
Justice of the Superior Court
Dated: September 21, 2000

 The claim against Martin Cohen had been dismissed on July 8, 1996 for failure to serve him.

 In assessing the amount due by Dataprint, Keon added his commission onto the amount he thought he would owe the seller of the press. Keon believed that he would be able to purchase the press for $90,000. This was a close approximation in light of the fact that Dataprint purchased the press for $95,000 (includes shipping costs). In fact, in this case, the price that Keon quoted, $119,000, less the price Dataprint paid, $95,000, equals almost exactly what Keon expected to realize as a broker’s fee.

 Consistent with the procedures of Superior Court Rule 9A, plaintiff shall submit his request for attorneys fees to the defendants’ attorney, on or before October 15, 2000, and thereafter to the court.